FILED  *Burn into Ct*
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  FEB 0 6 2024  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**UNITED STATES OF AMERICA,**

      Plaintiff,

*ex rel.* **RELATOR LLC**, a California limited
liability company,

      Relator,

    v.

**MICHAEL WERZBERGER,** an individual,
**REBECCA ROZENWEIG**, an individual,
**ASTRA HOME CARE, INC**, a New York
Corporation dba **TRUE CARE HOME
HEALTH, TRUE FAMILY CARE
SERVICES LLC**, a New York limited
liability company, **HILITE MANAGEMENT
LLC**, a New York limited liability company,
**TRUE CARE SOLUTIONS LLC**, a New
York limited liability company, and DOES 1-
10,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Case No.

**CV 24 - 0899**

**COMPLAINT FOR VIOLATIONS OF
FEDERAL FALSE CLAIMS ACT**

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)**

ROSS, J.

POLLAK, M.J.

**JURY TRIAL DEMANDED**

Plaintiff RELATOR LLC ("Plaintiff") complains of **MICHAEL WERZBERGER**, an individual, **REBECCA ROZENWEIG**, an individual, **ASTRA HOME CARE, INC**, a New York Corporation dba **TRUE CARE HOME HEALTH** ("ASTRA"), **TRUE FAMILY CARE SERVICES LLC**, a New York limited liability company ("AFFILIATE 1"), **HILITE MANAGEMENT LLC**, a New York limited liability company ("AFFILIATE 2"), **TRUE CARE SOLUTIONS LLC**, a New York limited liability company ("AFFILIATE 3", together with AFFILIATE 1 and AFFILIATE 2, hereinafter collectively, the "AFFILIATES"), and DOES 1-10. ASTRA together with the AFFILIATES hereafter the DEFENDANT COMPANIES.

## JURISDICTION & VENUE

1.      This Court has subject matter jurisdiction over the Plaintiff's claims brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

2.      Plaintiff The United States of America is also located in the Eastern District of New York. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Eastern District of New York, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.[1]

3.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Eastern District of New York.

---

[1] ASTRA operates throughout New York, and has its headquarters in Brooklyn, New York, in the Eastern District of New York.

1

4.      Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public disclosure unknown to Relator, it is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

## INTRODUCTION AND SUMMARY

5.      In this matter the owners and operators of an assisted living home healthcare agency used their business to misappropriate millions of dollars from the US Federal government's Paycheck Protection Program ("PPP"). In order to obtain the *four (4) separate loans* totaling *more than $15 million*, the Defendants presented many falsified loan documents to the SBA. Defendants made false statements to obtain more than the amounts permitted under the program and falsified the number of employees on payroll. Defendants did not have any economic need for the loan, they simply took advantage. Defendants had no economic need for payroll assistance, assuming the loan was used on payroll. Defendants falsified additional documents which were presented to the government to obtain total loan forgiveness, billing millions to the US taxpayer.

6.      Michael Werzberger and Rebecca Rozenweig used their assisted living home healthcare agency, ASTRA and its affiliates, to apply for and receive four (4) PPP loans totaling **$15,288,100.00**, purportedly to cover payroll costs. However, the Defendants:

a.      Falsified loan eligibility;

b.      Falsified the number of jobs;

c.      Falsified the need for loan forgiveness;

d.      Falsified the use of the loans on authorized expenses;

e.      Falsified the economic necessity for the loans; and

f.      Falsified eligibility for loan forgiveness.

7.      <u>Falsified Number of Jobs Reported</u>. Each of ASTRA and AFFILIATE 1 claimed to have exactly 500 employees, which is not coincidentally the maximum number of employees that a borrower could have under the PPP and CARES Act in order to qualify for a PPP loan. Pursuant to any reasonable interpretation of ASTRA's and AFFILIATE 1's employee number calculation, it is clear that their statements that each had <u>exactly 500 employees</u> is false. The Defendants deliberately provided false information on their PPP applications by inflating the number of jobs to obtain larger loan amounts. ASTRA applied for and obtained the near maximum loan amount allowed, $9,583,500.00. ASTRA's own LinkedIn shows that the company only employs between 2 and 10 people. ASTRA does business as True Care Home Health. True Care Home Health's LinkedIn page shows that it has between 1,001 and 5,000 employees. Additionally, ASTRA's ZoomInfo shows that ASTRA employs less than 25 people. None of the AFFILIATES has any online presence whatsoever. This is because, there is only one business, which is ASTRA dba True Home Health Care. The AFFILIATES are all part and parcel of that business. The Defendants grossly exaggerated and falsely stated the number of actual employees that they had in order to maximize the amount of loan proceeds that they misappropriated from the government.

7.      <u>Falsified Loan Eligibility - Failure to Apply Affiliation Rules</u>. Relator is informed and believes that the DEFENDANT COMPANIES are directly or indirectly, wholly owned and controlled by the individual defendants. The SBA's Affiliation Rules require that the total number of an applicant's employees plus the employees of affiliates under common control be included in any calculation to determine if a borrower is a "small-business concern." The DEFENDANT

COMPANIES failed to include the number of employees of their affiliates in the total employee number calculation and therefore misstated that they were each a small business concern.

8.    <u>Four (4) Separate Loans, from three (3) Separate Lenders: Intent to Deceive</u>. The COMPANY DEFENDANTS received four (4) separate loans, from three (3) separate lenders, despite the fact that every single one of the loans was approved within one week of each other and three of them were approved within one day of each other. The Defendants went through the extreme effort of finding separate lenders for the loans, even though every single one of the Defendants shares the same physical address in Brooklyn, New York and is allegedly in the same line of business. The Defendants used different lenders because they wanted to conceal their fraud. Each of ASTRA and AFFILIATE 1 claimed to have exactly 500 employees, the maximum number of employees a borrower could have and continue to be eligible for a PPP loan. ASTRA and AFFILIATE 1 had to go to different lenders in order to conceal their fraud. AFFILIATE 2 AND AFFILIATE 3 also used a different lender from ASTRA and AFFILIATE 1, despite being in the same business, same industry, applying at the same exact time and being at the same exact physical address. The Defendants thought through their fraud. This was no accident or mistake. The fraud was intentional and the actions the Defendants took reflects their desire to mislead the US government and steal from the US taxpayer.

9.    <u>Assisted Living Home Healthcare: Flourishing Amidst the COVID-19 Pandemic – No Economic Necessity</u>. The Defendants did not interrupt operations for one single day during the pandemic. Their business thrived during the pandemic. In fact, it was evident from the onset of the pandemic that assisted living home healthcare agencies, like ASTRA, would thrive financially during the pandemic, and therefore ASTRA could not in good faith make the Economic Necessity Certification. This was evident for a number of reasons at the onset of the pandemic, including,

the clear, unprecedented demand for assisted living home healthcare professionals, their ability to rapidly deploy assisted living professionals and scale their business, and increased rates and profitability. The outbreak of COVID-19 created an urgent need for assisted living home healthcare professionals on an unprecedented scale. The pandemic highlighted the importance of quality healthcare and support for seniors and vulnerable populations. As individuals and families became more concerned about the risks of communal living and nursing homes, there was an increased demand for home healthcare services and assisted living facilities that could provide a safer and more personalized care environment. With the emphasis on reducing the risk of infection, there was a shift towards home-based care. Many individuals and families preferred home healthcare services to limit exposure to the virus. This led to an increased demand for services such as in-home nursing, personal care, and therapy provided by assisted living home healthcare agencies. Home healthcare companies, like ASTRA, with their vast industry knowledge knew better than others that this would be the case, and that with their vast networks of qualified professionals, they could and did quickly position themselves to meet this surge in demand. By providing patients with access to a diverse pool of home healthcare workers, these companies, like ASTRA, *immediately* became indispensable in the battle against the pandemic, thereby ensuring their financial prosperity. It was immediately clear to ASTRA that they had become indispensable and much more profitable long before they submitted their PPP loan application. The ability of ASTRA to rapidly deploy personnel was a key factor in its financial triumph during the pandemic. Through providing assisted living home healthcare to a vulnerable senior population during the covid-19 pandemic, assisted living home healthcare companies, like ASTRA, obtained a windfall in exploiting the demand for continuity of care. This swift and efficient deployment model allowed them to attract more contracts and generate substantial revenues throughout the pandemic. The

5

surge in demand for healthcare personnel during the COVID-19 crisis gave rise to increased rates for these essential services. Plaintiff is informed and believes that assisted living home healthcare companies, like ASTRA, capitalized on this opportunity by negotiating higher compensation rates for their healthcare professionals. Moreover, with the need for specialized staff reaching critical levels, agencies could charge premium rates for scarce specialties, further boosting their profitability. The combination of heightened demand, increased rates, and efficient deployment strategies resulted in substantial financial gains for assisted living home healthcare companies, like ASTRA. The success of assisted living home healthcare companies, like ASTRA, during the COVID-19 pandemic was both predictable and impressive.

10.    <u>No Business Interruption – No Economic Necessity</u>. On the SBA's website PPP loans are described as "[a}n SBA-backed loan that helps businesses keep their workforce employed during the COVID-19 crisis." It was called the "paycheck protection program" after all. The Defendants were also required to make the economic necessity certification, certifying that the "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." However, this certification would be false if there was no interruption of the business activities of the applicant. The Defendants did not experience any business interruption whatsoever during the pandemic and in fact their business expanded. On March 27, 2020 in the midst of the pandemic, the Defendants' Director of Operations Shana Fireworker took to social media and admitted that there was no business interruption with the following message to the "home-health aids" who were continuing to work during the pandemic:

> "This message is for our wonderful and dedicated *home health-aids who are putting themselves out there on the front line to take care of our patients in the middle of what's going on around us*…this crisis…and there are so many health concerns. And, all of you are *continuing to be dedicated and devoted to our clients.* And, *we are here working in the office, very spread apart but we are here,* doing everything we can to support you, be available for you and do everything we can

to make the care that you are providing a little bit easier. We just wanted to take a moment and thank you so, so much for your dedication, and thank you for being a part of our True Care family."

The Defendants experienced no business interruption. Their Payroll Staff (defined below) and non-Payroll Staff all continued to work. Since there was no business interruption, they could not in good faith certify that there was economic uncertainty making the PPP Loans necessary.

11.    <u>Defendants' Business Model – Double Dipping and No Economic Necessity</u>. Home healthcare agencies, like the DEFENDANT COMPANIES, are not the end user of the workers that they handle, rather they are the middle-men and brokers of such workers. A home healthcare agency's client is the individual or business that needs the care services of the healthcare workers that the healthcare agency brokers. Outside of a small internal administrative staff, the DEFENDANT COMPANIES, like most other home healthcare agencies do not keep the workers that they broker as employees on their payroll. Rather, it is only when a client needs a worker that the DEFENDANT COMPANIES step in and broker a temporary employment transaction. This means that <u>every single time</u> that the DEFENDANT COMPANIES brokers a worker in this manner, someone else (the client) is actually paying the worker's salary, and the DEFENDANT COMPANIES, as the middle-man, just takes a cut of that pay. So, for every single one of the more than 1,000 employees for which ASTRA and the AFFILIATES received PPP money (outside of a very small number of internal administrative staff) this necessarily means that the Defendants were <u>paid twice</u>, once by the client, next by the US taxpayers. This also means that there was absolutely no economic necessity, because the Defendants were never obligated to pay a salary to any of these workers to maintain its operations, since the only way that their business model requires payment to these workers is when the Defendants have brokered a deal for their services. Plainly put, Defendants would not pay the workers not to work. If they ever worked, someone else would pay. On their applications, ASTRA claimed that 80% of the loan proceeds would be used for salaries

7

and the AFFILIATES claimed that 100% of the loan proceeds would be used for salaries. Interestingly, ASTRA claimed that the remaining 20% of the PPP loan would be used for rent, and the AFFILIATES made no allocation for rent, even though all of the DEFENDANTS share the same office in Brooklyn, New York. The Defendants certified that the economic uncertainty made the loan requests necessary to support their ongoing operations. In light of the Defendants' business model of only paying an employee, when a client-business was paying that employee's salary, there is no conceivable way for this certification to be true. Rather than protecting the paychecks of employees, the Defendants received an unearned $15.2 million windfall from the PPP in order to pad their profits.

12. _Falsified Loan Eligibility_. ASTRA and the AFFILIATES were ineligible to receive PPP loans because non of them was a small-business. On their loan applications, the Defendants certified that they employed "no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry." ASTRA and AFFILIATE 1 claimed the maximum number of 500 employees and received near the maximum loan amount. In falsely claiming 500 employees, each of ASTRA and AFFILIATE 1 claimed the maximum number of employees that would allow it to be exactly at the maximum number of 500 employees to be eligible for a PPP loan. However, if ASTRA and AFFILIATE 1's manner of counting employees (i.e. all available workers not on payroll) is determinative then they each had thousands of employees and were therefore ineligible because they were not a small business at the time that they applied for the loan. Furthermore, the size standard for businesses in the Defendant's industry (NAICS Code 621610, Home Health Care

Services) was $16,500,000[2] as of the date ASTRA's loan was approved, and Relator is informed and believes that ASTRA's annual receipts were well in excess of $16,500,000. Among other things, it is clear from ASTRA's stated payroll of $9,580,000 for 2.5 months of salaries that the annual receipts of ASTRA were far in excess of the $16,500,000 maximum. Specifically, ASTRA certified that 100% of the $9,580,000 loan was to be used for payroll, which under the PPP and CARES Act rules equates to two and one-half (2 ½) months of salaries, which annualized is equal to annual salaries totaling more than $38 million. Therefore, unless ASTRA operated at a more than $30 million dollar loss when it applied for the loan, it had annual receipts in excess of the $16.5 million size standard applicable to NAICS Code 621610, Home Health Care Services. Accordingly, ASTRA was not a small business and was not eligible to apply for and receive the PPP Loan.

13.    Falsified Use of Loan Proceeds on Authorized Expenses. On their loan applications, ASTRA claimed that 80% of the loan proceeds would be used for salaries and the AFFILIATES claimed that 100% of the loan proceeds would be used for salaries. The DEFENDANT COMPANIES claimed to have 1,044 employees, when, in truth, only a small number of those 1,044 employees were internal administrative staff. Therefore, when they certified that the PPP loan proceeds would be used for the salaries of such workers, that certification was false. Specifically, the Defendants simply used the PPP proceeds to increase their profits.

14.    Money Not Returned. The loans were taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. The **$15,288,100.00** in funds should have been returned immediately. These loans should never have been sought in the first place. Yet

---

[2] The size standards themselves are expressed either in number of employees or annual receipts in millions of dollars, unless otherwise specified. The number of employees or annual receipts indicates the maximum allowed for a concern and its affiliates to be considered small.

the Defendants went further by obtaining total loan forgiveness, billing the US taxpayers millions of dollars. *Defendants have not returned the loan proceeds.*

15.    <u>Further Falsification on Loan Forgiveness</u>. Defendants falsified further documents to receive loan forgiveness. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They were not because Defendants could not comply with the requirements of forgiveness given their ineligibility, exorbitant amounts borrowed and false statements regarding numbers of employees. So, Defendants also lied on their forgiveness documents and application.

16.    <u>Defendant's False Statements and Fraud</u>. Defendants knowingly and intentionally made many materially false statements to the government and bank to obtain the loans.

17.    Plaintiff brings this action as relator on behalf of the United States to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 Plaintiff gave notice of its intent to file and full disclosure of the evidentiary basis to the Department of Justice ("DOJ").

## THE PARTIES

18.    Plaintiff is a California limited liability company with its principal place of business in Los Angeles, California.

19.    Defendant Michael Werzberger is an individual and, at all relevant times herein, is and was the Chief Executive Officer of ASTRA. Relator is informed and believes that Michael Werzberger is and was an owner and controlled each of the AFFILIATES.

20.    Defendant Rebecca Rozenweig is an individual and, at all relevant times herein, is and was an officer of ASTRA. Relator is informed and believes that Rebecca Rozenweig is and was an owner and controlled each of the AFFILIATES.

21.    Defendant Astra Home Care, Inc. is a New York Corporation formed in 2011 with its principal place of business located at *117 Church Avenue, Brooklyn, New York 11218*.

22.    Defendant True Family Care Services, LLC. is a New York limited liability company formed in 2016 with its principal place of business located at *117 Church Avenue, Brooklyn, New York 11218*.

23.    Defendant True Care Solutions, LLC. is a New York limited liability company formed in 2014 with its principal place of business located at *117 Church Avenue, Brooklyn, New York 11218*.

24.    Defendant HiLite Management LLC. is a New York limited liability company formed in 2019 with its principal place of business located at *117 Church Avenue, Brooklyn, New York 11218*.

25.    Relator is informed and believes that ASTRA and its AFFILIATES all operate one business, which is a home healthcare agency doing business as True Home Health Care in the State of New York.

26.    The true names and capacities, whether individual, partner, associate, corporate or otherwise, of Defendant DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff, who therefore sues said Defendant(s) by such fictitious names. Plaintiff is informed and believes and thereon alleges that each Defendant designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein mentioned. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of said DOES, and add appropriate charging allegations against said DOES when their identities have been ascertained. Plaintiff is informed and believes that each of the DOE Defendants were responsible in some manner for the injuries and damages alleged herein, and/or for the wrongful acts of some or all of the Defendants.

27.     Plaintiff is further informed and believes that each of the Defendants, whether specifically named or named as a DOE, was an agent, employee, servant and/or representative of each of the remaining Defendants, and, in doing or failing to do the things alleged herein, was acting within the course and scope of said agency, employment, service and/or representation.

28.     Plaintiff is further informed and believes that each of the Defendants, whether specifically named herein or named as a DOE, approved, ratified and/or acquiesced in the acts and omissions of each of the remaining Defendants.

29.     Plaintiff is further informed and believes that each of the Defendants herein, whether named as DOES or otherwise, acted in concert, agreement and conspiracy with the other Defendants for the common purpose of engaging in a scheme to defraud as alleged below.

## THE CARES ACT AND PAYCHECK PROTECTION PROGRAM

30.     On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and provided emergency assistance and health care response for eligible individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

31.     The CARES Act authorized loans to eligible small businesses struggling to pay employees and stay in business as a result of the devastating effect of the COVID-19 pandemic and resulting restrictions.

32.     Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program" ("PPP").

33.    On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) was enacted to provide additional funding and authority for the PPP. On June 5, 2020, the PPP Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) was enacted, changing key provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

34.    Under the PPP, in 2020, eligible businesses could obtain one SBA guaranteed PPP loan. Businesses were required to spend all loan proceeds only for employee compensation, rent or mortgage, and certain other specified expenses. Depending on their use of the loan proceeds as certified, they could qualify for loan forgiveness, up to the full amount of the loan.

35.    The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, whether a "First Draw" or "Second Draw" loan, an eligible business (through its authorized representative) had to sign and submit a PPP loan application (SBA Form 2483) online through the lender's platform. The PPP loan application (SBA Form 2483) required the business (through its representative) to acknowledge the PPP program rules and make certain certifications in order to be eligible to obtain the PPP loan, including certifying that their certifications were true.

36.    Once the Borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the lender, it funded the PPP loan with its own funds, which were 100% guaranteed by the SBA.

37.    After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying

13

for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer

Yes to the following questions in the Lender's Application - Paycheck Protection Program Loan

Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to receive

a PPP Loan:

| | | | |
|---|---|---|---|
| • | The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | ☐ Yes | ☐ No |

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan

application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit

to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program

Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

38.     SBA Form 2483 includes the following certification, among others: "I have read

the statements included in this form, including the Statements Required by Law and Executive

Orders, and I understand them" (the "Understanding Certification").

39.     SBA Form 2483 also includes the following certification, among others: "The

Applicant is eligible to receive a loan under the rules in effect at the time this application is

submitted that have been issued by the Small Business Administration (SBA) implementing the

Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (the "Eligibility Certification").

40.     SBA Form 2483 also includes the following certification, among others: "The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry" (the "Size Certification").

41.     SBA Form 2483 also includes the following certification, among others "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (the "Use of Proceeds Certification").

42.     SBA Form 2483 also includes the following certification, among others: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" (the "Economic Necessity Certification").

43.     SBA Form 2483 also includes the following certification, among others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (the "Worker Retention and Payroll Certification").

44.     SBA Form 2483 also includes the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has

not and will not receive another loan under the Paycheck Protection Program" (the "Single Loan Certification").

45. SBA Form 2483 also includes the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (the "No False Statements Certification").

46. After the borrower submitted a PPP loan application, it was processed by the participating lender. If the PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lender and be responsible for its repayment.

47. Under applicable SBA rules and guidance, recipients of PPP loans could apply to have principal and interest on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

16

48.     Loans could only be used for certain permitted expenses, such as to pay employees' salaries, employee benefits, mortgage interest, rent, utilities or worker protection costs related to COVID19.

49.     More specifically, the loan forgiveness application (SBA Form 3508), revised as of July 30, 2021, included the following certifications, among others:

(1)     The dollar amount for which forgiveness is requested:

- was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);

- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;

- includes payroll costs equal to at least 60% of the forgiveness amount;

- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and

- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

(2)     I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

(3)     The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.

(4)    The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application.

## DEFENDANTS' FRAUD

50.    During round 1 of the PPP, Defendant ASTRA applied for a PPP loan for **$9,583,500.00**. It was approved on May 6, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Dime Community Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had exactly 500 employees for which it needed the loan. This loan was forgiven as of June 11, 2021.

51.    During round 1 of the PPP, Defendant AFILIATE 1 applied for a PPP loan for **$5,111,400.00**. It was approved on April 30, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by The Bank of Greene County. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had exactly 500 employees for which it needed the loan. This loan was forgiven as of August 4, 2021.

52.    During round 1 of the PPP, Defendant AFILIATE 2 applied for a PPP loan for **$416,500.00**. It was approved on April 29, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Loan Source Incorporated. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had exactly 21 employees for which it needed the loan. This loan was forgiven as of March 31, 2021.

53.    During round 1 of the PPP, Defendant AFILIATE 3 applied for a PPP loan for **$176,700.00**. It was approved on April 30, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Loan Source Incorporated. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had exactly 23 employees for which it needed the loan. This loan was forgiven as of June 11, 2021.

54.     As an assisted living home healthcare agency, the Defendants serve as a middleman between workers seeking employment as home caregivers and at-home care recipients or businesses that provide such services that need at-home caregivers. When the Defendants place a home healthcare worker, the individual or business then pays the worker's wages directly to the Defendants, who then takes a cut of that pay and then pays the worker. The Defendants operate off of platforms like care.com, where they offer services to individuals seeking assistance at home. The Defendants only have a small, internal administrative staff of professionals who are on their payroll (the "Payroll Staff"). The Payroll Staff recruit, organize and broker the actual home healthcare workers who perform the assisted living work and who are not on the Defendants' payroll. The Defendants do not have any payment or employment obligation to the non Payroll Staff, which is the vast number of other workers on the Defendants' roster who are not part of the Payroll Staff, and are only ever obligated to pay these other workers when they have been placed with a client. When these non-Payroll Staff are placed at a client, the client pays these workers' wages. In other words, the Defendants are only required to pay these non Payroll Staff workers when someone else is paying them.

55.     The individual defendants who founded ASTRA in 2011 knew their business model well when they applied for the PPP Loans. The individual defendants understood that the proceeds of the PPP loans would simply just pad their profits. Therefore, when Defendants made the Economic Necessity Certification, the certification was false.

56.     The Defendants, as veterans of the assisted living home healthcare industry, knew that the COVID-19 pandemic presented a unique opportunity for the, to make much more money than in the absence of the pandemic. As industry veterans they knew that the COMPANY

19

DEFENDANTS would experience an economic boon during a health crisis and that the Economic Necessity Certification was false when they made it.

57.     The Defendants also knew when they claimed each of ASTRA and AFFILIATE 1 had exactly 500 employees that such a statement was false. First, neither of ASTRA nor AFFILIATE 1 had <u>exactly 500 employees</u>. Then, ASTRA and AFFILIATE 1 inflated their numbers to include fake jobs in order to receive larger PPP loans and pad corporate profits. In fact, none of the COMPANY DEFENDANTS was eligible to receive a single penny from the PPP because upon application of the SBA's Affiliation Rules, none of the COMPANY DEFENDANTS would be considered a small business.

58.     In addition to applying any applicable business type ineligibility rules, all borrowers should carefully review the required Economic Necessity Certification on the Borrower Application Form stating that ''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''

59.     The Defendants abused the PPP program, from misrepresenting their economic need for the loans to willfully ignoring their ineligibility, to maximizing the amount of the loans and then obtaining loan forgiveness. Discovery will reveal where the millions in PPP funds were actually spent, but what is obvious is that Defendants *did not need any money from US taxpayers*. The Defendants' business is and was highly profitable during the pandemic, just like most in their industry. They did not suffer any business loss and certainly had the money to pay their own workers' wages.

60.     Defendants signed the loan applications, thereby endorsing the Understanding Certification, which means that they agreed that they understood the rules and guidelines of the PPP, including, without limitation the rules regarding use of proceeds and the certifications made.

61.    The proceeds of the PPP Loans were not and could not have been used only for authorized purposes consistent with the PPP Rule, because, among other things, the Defendants were obviously not allowed to take PPP loans, in the amount received, because of their smaller size. Therefore, when Defendants made the Use of Proceeds Certification, the certification was false.

62.    The PPP loan money was only allowed to be used on authorized expenses. The proceeds of the PPP Loan were not needed to retain imaginary workers and maintain payroll, therefore when Defendant made the Worker Retention and Payroll Certification, the certification was false.

63.    By virtue of the above false statements, when Defendants made the No False Statements Certification, that certification was false.

64.    The Defendants actively pursued and obtained loan forgiveness. Because the COMPANY DEFENDANTS were prohibited from obtaining any PPP loans, its representation on its forgiveness application that it spent 100% of the loan proceeds on eligible expenses was not truthful. The SBA would not have forgiven the loans if they knew Defendants' certifications described above were false.  They also would not have forgiven the loans if they knew the proceeds had been used to increase profits instead of paying their employees.

65.    As a result of the forgiveness, Defendants have not repaid the loan and have kept the proceeds, and the loan has been repaid with money from taxpayers, including the small businesses and owners who were supposed to receive the PPP funds instead of repaying a profitable assisted living home healthcare company's loan that it never should have received, let alone had forgiven.

## THE FALSE CLAIMS ACT

66.     The False Claims Act prohibits fraudulent conduct in connection with federal programs, including the knowing submission of false claims for payment to the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may attach if the omission renders those representations misleading. 41. 31 U.S.C. § 3729(a)(1)(A) and (B) of the FCA provide that:

(1) . . . any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

22

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be

spent or used on the Government's behalf or to advance a Government program or interest, and if

the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded;

or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money

or property which is requested or demanded; . . .

31 U.S.C. § 3729(b)(2) (2020).

67.    A person who violates the False Claims Act during the time period at issue "is liable

for a civil penalty as adjusted, plus 3 times the amount of damages which the United States

Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. §

85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments

for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/COMMERCE/2022-

09928.COMMERCE.

## FIRST CAUSE OF ACTION

## FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A-B))

68.    Plaintiff alleges and incorporates by reference each and every allegation contained

in all prior paragraphs of this complaint.

69.    This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. § 3729, et seq., as amended.

70.    By virtue of the acts described above, Defendants knowingly presented, or caused

to be presented, to an officer or employee of the United States government, false or fraudulent

claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A). Specifically,

each of Defendants' Economic Necessity, No False Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and Payroll Certifications described above all were knowingly false, and relied upon by lenders and the SBA in approving the PPP Loans. Their request for forgiveness contained a further misrepresentation that the loans had been used only for authorized purposes.

71.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

72.     The Government and its agents and contractors relied on those false statements in approving and making the loans and subsequently forgiving them, leaving the burden of repayment on taxpayers.

73.     Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein, and attorneys' fees in an amount to be proven.

## CONCLUSION

74.     The Defendants abused the PPP. The PPP was meant for struggling businesses. Now that program is dry. The American people have a right to reconciliation.

## **PRAYER FOR RELIEF**

WHEREFORE, qui tam Plaintiff/Relator prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3. Reasonable attorney fees, litigation expenses, and costs of suit.

### **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: February 5, 2024                           Respectfully submitted,

                                                  *David L. Hecht*
                                                  David L. Hecht
                                                  HECHT PARTNERS LLP
                                                  125 Park Avenue, 25th Floor
                                                  New York, NY 10017
                                                  (212) 851-6821
                                                  dhecht@hechtpartners.com

                                                  Attorneys for Plaintiff-Relator
                                                  RELATOR LLC